William HORTON, Plaintiff-Appellee,

v.

MILLER CHEMICAL CO., INC., Defendant-Appellant.

No. 84–3012.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 23, 1985.

Decided Nov. 6, 1985.

Rehearing and Rehearing En Banc Denied Nov. 27, 1985.

John E. Cassidy, Jr., Cassidy & Mueller, Peoria, Ill., for defendant-appellant.

James R. Carter, Law Offices of Strodel, Kingery & Durree, Peoria, Ill., for plaintiff-appellee.

Before POSNER and FLAUM, Circuit Judges, and SWYGERT, Senior Circuit Judge.

SWYGERT, Senior Circuit Judge.

In this diversity action, plaintiff William Horton sued his former employer, defendant Miller Chemical Company, Inc. ("Miller Chemical"), for retaliatory discharge. He claimed that the defendant discharged him for pursuing his rights and remedies under the Illinois Workers' Compensation Act ("the Act"), Ill.Rev.Stat., ch. 48, ¶¶ 138.1 et seq. (1983). The jury returned a verdict in favor of the plaintiff and awarded him $73,-824 in compensatory damages and $100,000 in punitive damages.

On appeal the defendant argues that the complaint failed to state a claim for relief under Illinois law and that the district judge erroneously refused to grant its motions for a directed verdict and for judgment notwithstanding the verdict ("JNOV"). The defendant also argues that the plaintiff failed to prove that he was entitled either to $73,824 in compensatory damages or any punitive damages. Finally, he argues that a new trial is required because the verdict was against the manifest weight of the evidence and because the jury instructions on retaliatory discharge were incorrect as a matter of Illinois law. We hold that the district judge should have granted the defendant's motion for JNOV. We therefore do not reach the other three issues presented in this appeal.

I

A

At trial the district judge submitted to the jury the parties' stipulation of uncon-

tested facts. The parties stipulated that the plaintiff had a truck driver/delivery job with the defendant and that the plaintiff sustained injuries on April 24, 1981 for which he sought medical treatment. They also stipulated that

> [o]n or about April 27, 1981, Plaintiff informed ... [the defendant] that the Plaintiff's ... [doctor] recommended that Plaintiff be excused from work and further recommended that the Plaintiff was to do no more lifting in order to avoid aggravation of his condition which was caused by the incidents on April 24, 1981.

In addition, the following evidence was presented. On January 16, 1978 the plaintiff was hired by his brother-in-law, then manager at the defendant's Peoria, Illinois office, to be a truck driver/delivery man for the defendant. Plaintiff's job consisted of delivering 55-pound bags of product to the defendant's customers in the northern half of Illinois and the southern part of Wisconsin. When he was initially hired, the plaintiff informed his brother-in-law that he had had a series of lower back problems starting in 1955 and that this might interfere with his ability to work because he would have to lift the 55-pound bags. During the first week of February 1978 the plaintiff voluntarily resigned because the work was aggravating his back problems. He returned to work on February 20, 1978, and he was rehired by his brother-in-law. In April 1978 he again quit; he was again rehired by his brother-in-law on August 7, 1978. In neither of the instances did the plaintiff file a worker's compensation claim.

In 1979 the plaintiff began to seek different employment because the job with the defendant increased his back problems. He applied for a job for which he allegedly would have received a higher salary, but he was dissuaded from taking it by Larry Hoffman, the defendant's general manager, who told him he would be better off working for the defendant. In March 1980

the plaintiff strained his back while on the job. He filed a worker's compensation claim without the assistance of an attorney which he settled with the defendant's insurance company for $3,056.84.

On April 24, 1981 the plaintiff injured his back while unloading materials from one of the defendant's trucks. Plaintiff reported the incident to Richard Dunham, the new manager of the defendant's Peoria office and plaintiff's brother-in-law's replacement. Dunham authorized him to see the plaintiff's personal doctor. On April 27, 1981 the plaintiff visited his physician, Dr. Grogg. Dr. Grogg diagnosed the plaintiff as suffering from a disc protrusion at the fifth lumbar vertebra and gave him an "Authorization for Absence" slip in which he recommended that the plaintiff be excused from work for approximately one week and that the plaintiff engage in no lifting. The slip did not indicate whether the plaintiff was only to refrain from lifting for one week or whether he was to forever refrain from lifting.

On that same day the plaintiff presented the authorization slip to Dunham. Dunham called his supervisor, Hoffman, in Omaha and told him that the plaintiff had received doctor's instructions not to do any more lifting. Dunham informed him of the plaintiff's medical history of back problems and absences from work. Hoffman authorized Dunham to discharge the plaintiff because the plaintiff could not return to work and to hire another truck driver. When plaintiff went to the company the next day, Dunham called him into his office and told him, "I've talked to Larry Hoffman in Omaha and— ... I'm sorry, ... but we have to terminate you.... You're a bad risk. We can't keep you on this employment."[1]

Hoffman testified that the company had no set policy concerning sick leave; the local manager—Dunham—had discretion over granting such leave. He also testified that he never gave any thought to recom-

---

1. It is unclear whether the defendant disputes making the statement. For purposes of this appeal, we assume the statement was made.

mending that the plaintiff take vacation time, nor did he advise Dunham to tell plaintiff that his medical bills should be submitted to the company for payment. He further testified that no one at the company made any independent effort to discuss the plaintiff's medical condition with his doctor and no one later contacted the plaintiff to see if his condition had improved. Finally, he testified that a good employee who was injured on the job "very possibly" would not be terminated as long as he could come back and perform the work, but his understanding was that the plaintiff "could do no more lifting."

Dunham also testified that he understood the "Authorization of Absence" slip to indicate that the plaintiff could do no more lifting and that he told Hoffman about this. He agreed with Hoffman that no one at the company conducted an independent investigation of the plaintiff's medical condition, told the plaintiff that he would be entitled to make application for temporary total disability benefits, told the plaintiff to submit his medical bills to the company for payment, told the plaintiff if his condition improved he could come back to work, or told the plaintiff to take some vacation time.[2] Dunham also testified that the plaintiff had been a very good employee and that an employee who became injured or sick while on the job might be off work indefinitely before losing his job. Dunham further testified, and the plaintiff did not dispute, that he never said anything to the plaintiff about filing a worker's compensation claim. Dunham hired the plaintiff's replacement within two weeks after the plaintiff was discharged. The plaintiff never returned to the company again or contacted any officials there about reemployment.

Plaintiff subsequently retained an attorney and, in July 1981, filed a claim for worker's compensation which was settled by Aetna Casualty and Surety Company on October 9, 1981, for $6,800 plus reimbursement for any additional medical expenses personally paid for by the plaintiff.[3] In a letter written to the plaintiff's attorney, Hoffman explained that the plaintiff had been terminated because he could no longer do any lifting and his job with the company required frequent heavy lifting.

In addition to the foregoing testimony, the deposition of Dr. Dennis J. Garwacki, one of the plaintiff's treating physicians, was read to the jury. At his deposition, Dr. Garwacki testified concerning the plaintiff's general physical condition in July 1981 and October 1983. As to his condition in July 1981, Dr. Garwacki stated the plaintiff "was improving ... [but] he could not return to the heavy lifting that he described." As to his condition in October 1983, he stated that the plaintiff "was normal." With respect to the plaintiff's ability to perform the work as a truck driver for the defendant, the doctor stated

> At that time [October 1983] he told me that he returned to work ... [as] a security officer and was not going to do any more heavy lifting and bending and I thought that he could probably return to work to that kind of occupation without any problems.... He could certainly have [a] recurrence of his [back] problem ... [if he returned to his job where he was lifting fifty and hundred pound barrels].

At trial the plaintiff said he did not disagree with the testimony given by Dr. Garwacki at his deposition. The plaintiff further testified that in October 1981 he believed he could return to work with the defendant and that, at the time of trial, he believed that his back was in as "good a condition" as it was when he was originally hired by the defendant. He also stated

---

**2.** The district judge admitted this testimony over the defendant's objection because he believed that it was relevant to the defendant's motive in discharging the plaintiff.

**3.** The settlement contract provided that "[s]ince a serious dispute arises as to the nature and extent of disability, if any, resulting from the aforesaid occurrence, the respondent offers and the petitioner agrees to accept $6,800, that amount representing $6\frac{1}{4}$% loss of use of each leg, plus 9 weeks of disputed temporary total disability benefits...."

that he had continued to see his regular physician, Dr. Grogg, until at least January 1982 for lower back adjustments.

## B

On February 11, 1983 plaintiff filed the instant action against the defendant alleging that he had been discharged in retaliation for pursuing his rights and remedies under the Act. The defendants removed the action to the United States District Court for the Central Division of Illinois because of diversity of citizenship.

In his complaint, the plaintiff alleged that, in violation of sections 4(h) and 8 of the Act,[4] the defendant discharged him "for seeking medical care for injuries arising out of and in the course of his employment and for his medical inability to work." The defendant moved for judgment on the pleadings, on the ground that the complaint failed to state a claim for retaliatory discharge. When that motion was denied, the defendant amended its answer and asserted that the plaintiff failed to state a claim under Illinois law.

At trial, after all of the plaintiff's evidence had been presented, the defendant moved for a directed verdict on the ground that the plaintiff had failed to state a claim for retaliatory discharge or, in the alternative, had failed to set forth any evidence from which it could be found that the plaintiff had been discharged for pursuing his rights and remedies under the Act. The defendant argued that the plaintiff had failed to state a claim because he did not plead that he had been discharged for filing or threatening to file a worker's compensation claim and that there could be no claim of retaliatory discharge if the defendant discharged the employee solely because of his "medical inability to work."

The district judge granted in part and denied in part the defendant's motion. He first observed that the plaintiff had presented three theories for relief: wrongful discharge, refusal to rehire, and failure to rehire in another job for which he was qualified. He granted the directed verdict on the two latter theories, reasoning that the Act imposed no affirmative duty on an employer to rehire an employee and that there was no evidence that the employer refused to rehire him either as a truck driver or in some other suitable capacity. As to the wrongful discharge theory, he recognized that because the plaintiff was an at-will employee, the employer could rightfully discharge him for his "medical inability to work." He ruled, however, that sufficient evidence had been presented from which a jury might infer that the

---

**4.** Pertinent parts of the Worker's Compensation Act read:

Section 4(h). It shall be unlawful for any employer, insurance company or service or adjustment company to interfere with, restrain or coerce an employee in any manner whatsoever in the exercise of the rights or remedies granted to him by this Act or to discriminate, attempt to discriminate, or threaten to discriminate against an employee in any way because of his exercise of the rights or remedies granted to him by this Act.

It shall be unlawful for any employer, individually or through any insurance company or service or adjustment company to discharge or to threaten to discharge, or to refuse to rehire or recall to active service in a suitable capacity an employee because of the exercise of his rights or remedies granted to him by Act.

Section 8. The amount of compensation which shall be paid to the employee for an accidental injury not resulting in death is:

(a) The employer shall provide and pay for all the necessary first aid, medical and surgical services, and all necessary medical, surgical and hospital services thereafter incurred, limited, however, to that which is reasonably required to cure or relieve from the effects of the accidental injury. The employer shall also pay for treatment, instruction and training necessary for the physical, mental and vocational rehabilitation of the employee, including all maintenance costs and expenses incidental thereto. If as a result of the injury the employee is unable to be self-sufficient the employer shall further pay for such maintenance or institutional care as shall be required.

The employee may at any time elect to secure his own physician, surgeon, and hospital services at the employer's expense:

. . . . .

(b) If the period of temporary total incapacity for work lasts more than 3 working days, weekly compensation as hereinafter provided shall be paid beginning on the 4th day of such temporary total incapacity and continuing as long as the total temporary incapacity lasts.

plaintiff had been discharged for seeking medical attention or to deter him from seeking further compensation under the Act. Specifically, he ruled

> I think as I indicated earlier this is a close question on the directed verdict, but there is evidence in this case that what he was told was that he was being terminated because he was a bad risk, not that he was unable to perform the work but that he was a bad risk. "Risk" can be argued in terms of the meaning. I don't know what it means but it is certainly open to argument.

The district judge states that were it not for the testimony regarding "bad risk" he would have directed a verdict in favor of the defendant.

## II

### A

The defendant argues that the complaint fails to state a cause of action. We need not address this issue, however, because we find that, even assuming the complaint states a cause of action, the judgment must be reversed because the defendant was entitled to a JNOV.

■ In diversity actions, state law governs the dispositions of motions for directed verdict and JNOV. *F.W. Hempel & Co., Inc. v. Metal World, Inc.,* 721 F.2d 610, 613 (7th Cir.1983); *Oberman v. Dun & Bradstreet, Inc.,* 507 F.2d 349, 352 (7th Cir. 1974). Under Illinois law, the state law governing this case, a directed verdict or JNOV should only be entered when all of the evidence, viewed in its light most favorable to the nonmoving party, so overwhelmingly favors the movant that no contrary verdict based on the evidence could ever stand. *McMahon v. Richard Gorazd, Inc.,* 135 Ill.App.3d 211, 89 Ill.Dec. 944, 948, 481 N.E.2d 787, 791 (5th Dist.1985) citing *Pedrick v. Peoria and Eastern Railroad Co.,* 37 Ill.2d 494, 510, 229 N.E.2d 504, 513–14 (1967). This circuit has held that under the *Pedrick* test a directed verdict or JNOV should be granted when "the evidence only supports one reasonable conclusion in defendant's favor." *Oberman,* 507 F.2d at 353.

Under this standard, *all* of the evidence must be considered. *Pedrick,* 37 Ill.2d at 502–03, 229 N.E.2d at 509. In addition, a directed verdict or JNOV may be appropriate even when the nonmovant has presented more than a mere scintilla of evidence, *id.; McMillen v. Carlinville Area Hospital,* 114 Ill.App.3d 732, 738, 70 Ill.Dec. 792, 450 N.E.2d 5, 10 (4th Dist.1983), although a directed verdict or JNOV is "highly inappropriate ... [in cases] where there ... [are] numerous factual questions to be presented to the jury." *Sandburg-Schiller v. Rosello,* 119 Ill.App.3d 318, 335, 74 Ill. Dec. 690, 702, 456 N.E.2d 192, 204 (1st Dist.1983). The non-movant "has the right to prove ... [his case] by circumstantial evidence, which consists of proof of facts and circumstances from which the jury may infer other connected facts, reasonably following from the proven facts and circumstances." *Id.,* 74 Ill.Dec. at 702, 456 N.E.2d at 204.

In Illinois, to recover for retaliatory discharge, a plaintiff must show that he was discharged "in retaliation for his activities, and that the discharge be in contravention of a clearly mandated public policy." *Palmateer v. International Harvester Co.,* 85 Ill.2d 124, 134, 52 Ill.Dec. 13, 18, 421 N.E.2d 876, 881 (1981). In most cases the plaintiff alleges that he was discharged because he filed, or threatened to file, a worker's compensation claim. *See, e.g., Kelsay v. Motorola, Inc.,* 74 Ill.2d 172, 23 Ill.Dec. 559, 384 N.E.2d 353 (1978). However, recent Illinois cases hold that a plaintiff can also establish a claim for retaliatory discharge if he can show that the employer's motive for discharging him was to interfere with his exercise of *any* of his rights under the Act. *See Darnell v. Impact Industries, Inc.,* 105 Ill.2d 158, 161, 85 Ill.Dec. 336, 338, 473 N.E.2d 935, 937 (1984) (plaintiff states a claim for retaliatory discharge when she alleges that her employer discharged her for filing worker's compensation claims against her former employer); *Wolcowicz v. Intercraft Industries Corp.,* 133 Ill.App.3d 157, 161, 88 Ill.Dec. 431, 434,

478 N.E.2d 1039, 1042 (1st Dist.1985) (plaintiff states claim for retaliatory discharge when he alleges that employer discharged him for no cause and that employer attempted to have plaintiff sign a waiver of all claims for work-related injuries); *cf. Burgess v. Chicago Sun-Times*, 132 Ill. App.3d 181, 185, 87 Ill.Dec. 292, 296, 476 N.E.2d 1284, 1287 (1st Dist.1985) (plaintiff fails to state a cause of action for retaliatory discharge when there was not a single allegation in plaintiff's complaint that he intended to seek relief under the Act or that the defendant was informed, or in anyway found out, that the plaintiff was pursuing any remedy under the Act and the defendant went ahead and discharged him because of it). Thus a claim for retaliatory discharge is not limited to those cases in which the employer is alleged to have discharged the employee because he filed or would have filed a worker's compensation claim.

On the other hand, a plaintiff does not establish a claim for retaliatory discharge if all he can show is that the employer refused to grant him the rights and remedies that he was entitled to under the Act. *See Robertson v. Travelers Ins. Co.*, 95 Ill.2d 441, 450–51, 69 Ill.Dec. 954, 958–9, 448 N.E.2d 866, 870–71 (1983). If, for example, an employee is entitled under the Act to temporary leave or temporary benefits because of a work-related injury, and the employer refuses to grant that leave or benefits, the employee is barred by the exclusivity provision of the Act from maintaining a separate common law action against the employer. *Id.; Cook v. Optimum/Ideal Managers Inc.*, 130 Ill.App.3d 180, 186–87, 84 Ill.Dec. 933, 937–38, 473 N.E.2d 334, 338–39 (2d Dist.1985). There is also no cause of action for retaliatory discharge if an employer merely discharges an employee because of the employee's status, and not for his activities. *See Mein v. Masonite Corp.*, 124 Ill.App.3d 617, 618, 80 Ill.Dec. 154, 155, 464 N.E.2d 1137, 1138 (1st Dist.1984) (no cause of action for "retaliatory discharge" when the employee alleg-

es that he was discharged because of his age, not because of his conduct or activity). *See also Thomas v. Zamberletti*, 134 Ill. App.3d 387, 390–91, 89 Ill.Dec. 387, 389, 480 N.E.2d 869, 871 (4th Dist.1985) (no cause of action for retaliatory discharge when plaintiff merely alleges that he was discharged for failing to report to work and not in retaliation for receiving medical treatment for injuries sustained in an automobile accident).

These Illinois' cases demonstrate that to show retaliatory discharge, the plaintiff must set forth sufficient facts from which it can be inferred that (1) he was discharged or threatened with discharge and (2) the employer's motive in discharging or threatening to discharge him was to deter him from exercising his rights under the Act or to interfere with his exercise of those rights.

B

█ In this case, there are no disputed facts.[5] Thus, this is not a case that is peculiarly "inappropriate" for resolution by a directed verdict or JNOV. Proceeding with the application of the *Pedrick* test to the facts of this case, it is clear that the plaintiff established that he was discharged. Nonetheless, it is equally clear that the plaintiff has simply failed to set forth sufficient facts from which a jury could reasonably infer, given all of the evidence presented at trial, that the defendant's motive in discharging him was to deter him from exercising, or to interfere with the exercise of, his rights under the Act. Thus, under the standard set forth in *Pedrick*, the defendant was entitled to a JNOV.

The evidence in the record that the defendant's motive for discharging the plaintiff was related to the exercise of his rights under the Act was (1) his own testimony that Dunham discharged him because he was a "bad risk," (2) the fact that he was discharged almost immediately after he had seen his own physician, (3) the fact

**5.** *See supra* note 1.

that the physician's report was ambiguous about whether the plaintiff was to *forever* refrain from lifting, (4) the defendant's failure to consider alternatives to discharging the plaintiff—a concededly good employee, (5) his own testimony that he was not permanently disabled, and (6) the defendant's knowledge that the plaintiff had previously filed a worker's compensation claim.

The district judge held, and we agree, that the plaintiff's testimony about "bad risk" was the only evidence that even hinted that the defendant's motives in discharging the plaintiff were linked to the Act.[6] He also acknowledged and we agree that the phrase "bad risk" is very ambiguous.[7] The fact that the plaintiff was discharged almost immediately after seeking medical attention was not probative of motive since the defendant had originally authorized him to take time off from work to see his physician.[8] The fact that the defendant knew that the plaintiff had successfully filed a previous claim for relief was also only probative of motive when coupled with the plaintiff's testimony regarding "bad risk." The other evidence only showed that perhaps the plaintiff had been unjustly treated because the defendant had erroneously decided that the plaintiff was permanently disabled. The plaintiff therefore presented some, albeit minimal, evidence that the defendant discharged him because he thought the plain-

tiff was a "bad risk" for exercising his rights under the Act.

Nonetheless, the probative value of this scant evidence is greatly diminished when viewed in light of the other evidence that was presented or that was completely lacking at trial. At trial, the plaintiff conceded that Dunham authorized him to take time off from work to consult a physician and that he did so. He also stipulated that he had informed the defendant on April 27 that his doctor recommended that he could do "no more lifting." There was no testimony that the plaintiff ever objected to the defendant about the discharge or that he ever asked for an explanation from Dunham about what he meant by "bad risk." The plaintiff did not suggest that any of the defendant's employees ever said anything to him about filing a worker's compensation claim or about his prior claim. In fact, the plaintiff insisted that none of the defendant's employees ever informed him about his rights under the Act. He did not dispute Dunham's testimony that at no time did Dunham and he ever discuss the plaintiff's rights under the Act. Moreover, the plaintiff conceded that he did pursue his rights under the Act without opposition by the defendant and that he received all of the temporary total disability to which he was entitled. Finally, the plaintiff failed to identify at trial the particular right or rights under the Act that the defendant was alleged to have interferred with[9] and,

---

6. We note that the plaintiff did not originally plead that Dunham had told him that he was a "bad risk." The "bad risk" theory developed at trial after the district judge decided that it was the only evidence that supported the plaintiff's claim.

7. This testimony is similar to the plaintiff's testimony in *Bryce v. Johnson & Johnson*, 115 Ill. App.3d 913, 922–23, 71 Ill.Dec. 356, 361, 450 N.E.2d 1235, 1240 (1983), that he was told by one of his superiors that he did not need a lawyer, but that the defendant would take care of him. As in this case, arguably it could be inferred from the plaintiff's testimony that the defendant meant to discourage the plaintiff from pursuing a claim, but as the court observed in *Bryce*, "[t]aking this testimony at face value, it is not by any means equivalent to even the slightest violation of ... [the Act] concerning restraint or coercion against the employee

in any manner for exercising his rights under the ... Act." *Id.*

8. In fact, the plaintiff has never argued that he had been discharged for having sought that medical attention.

9. Perhaps he intended to argue that because of this provision for temporary compensation, he also had a right to be off work temporarily and that the employer could not discharge him during that period. At trial, when questioned by the district judge about the theory of the case, plaintiff's counsel made vague references to the fact that he was entitled to temporary total disability compensation, *see* section 8(b). Although we can find nothing in the Act that provides that an employee cannot be discharged during the period that he is temporarily disabled, we note that if the plaintiff's theory is correct, plaintiff's exclusive remedy for the dis-

frankly, we simply cannot divine any from the record.

In addition, Hoffman and Dunham testified consistently with one another that they understood the doctor's note to mean that the plaintiff could do no more lifting, that he could therefore not perform his job and that, as a result, he had to be discharged. The plaintiff's personnel sheet indicated that he had had a series of back problems and that he had been terminated because the "[r]ecurrence of [an] old back injury prevents working." Hoffman informed the plaintiff's lawyer that the plaintiff was discharged because he could do "no more lifting." The plaintiff's doctor (who had no apparent interest in the outcome of this law suit) stated that in July 1981 the plaintiff could not return to a job requiring heavy lifting and that in October 1983 the plaintiff could suffer a recurrence of his back problems if he engaged in heavy lifting. The plaintiff testified that he did not disagree with these statements. He also testified that in October 1981, his back was in "as good a condition" as it was when he was hired—when he voluntarily quit for five months because his back "wouldn't take it." The plaintiff also continued to see his treating physician for "back adjustments" as late as January 1982.

Thus most of the evidence presented at trial, including that presented by the plaintiff, demonstrated that the plaintiff did indeed suffer from a back problem that prohibited him from working as a truck driver/delivery man and that he pursued all of his rights under the Act without opposition or interference by the defendant. In light of all of this evidence,[10] the plaintiff's own testimony with respect to the defendant's ambiguous statement regarding "bad risk," and his other evidence regarding how he may have been discharged unjustly were simply insufficient to support the

jury's verdict that the plaintiff was a victim of retaliatory discharge. *See Bryce v. Johnson & Johnson*, 115 Ill.App.3d 913, 922–24, 71 Ill.Dec. 356, 361–62, 450 N.E.2d 1235, 1240–41 (1st Dist.1983) (judgment in favor of plaintiff on claim for retaliatory discharge reversed even though the plaintiff testified that the defendant told him that "he didn't need a lawyer" when there was no evidence that the plaintiff was discharged, when there "is [a] total absence of even the slightest interference by the defendant in the exercise by plaintiff of all his rights under the ... Act," and when the plaintiff exercised his rights with complete effectiveness). *See also Pedrick*, 37 Ill.2d at 511, 229 N.E.2d at 514 ("When the dubious probative value of the testimony of the plaintiff's is considered in the light of the unequivocal testimony by persons with no apparent interest in the outcome of his lawsuit and the corroborative testimony of the ... [defendant's] employees, we believe that it may be fairly said that all of the evidence so overwhelmingly favors the defendant that a directed verdict should have been granted."). *Cf. Darnell*, 105 Ill.2d at 162, 85 Ill.Dec. at 338, 473 N.E.2d at 937 (Trial judge erroneously granted defendant's motion for directed verdict when the plaintiff testified that one of the defendant's employees told her that she was being discharged because she had filed a claim against her former employer and when the record contains documentary evidence that one of the defendant's employees called the plaintiff's prior employers to verify that she had previously filed claims.); *Wolcowicz*, 133 Ill.App.3d at 161, 88 Ill.Dec. at 434, 478 N.E.2d at 1042 (plaintiff states a claim for retaliatory discharge where he alleges that he was discharged without any reason being given and where defendant told the plaintiff, who read no English, to sign a document, written in

charge would be found under the Act. *See* discussion *supra* at 12.

**10.** *I.e.*, plaintiff's admission that he told Dunham he could do "no more lifting," his own testimony regarding the condition of his back, his own failure to testify that on April 27, 1981 he objected to his discharge, his own failure to

contact the defendants after he was discharged, Dunham's and Hoffman's highly inconsistent testimony, Garwacki's deposition, the documentary evidence, and the fact that Dunham never said to the plaintiff anything that even remotely smacked of retaliation other than "a bad risk."

English, waiving all claims against the defendant for work-related injuries).

It is possible that the plaintiff may have been discharged without just cause, but in Illinois an employer is not liable in tort for discharging an at-will employee because it erroneously believes that the employee is permanently disabled. Tort liability only attaches when the plaintiff sets forth sufficient evidence of the defendant's illegal motive. In this case that evidence was not presented.[11]

The judgment of the district court is reversed.

---

**11.** There is some hint in recent Illinois' cases that the burden of proof scheme set forth in *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); and *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), should apply in the instant case. *See Darnell,* 105 Ill.2d at 162–63, 85 Ill.Dec. at 339, 473 N.E.2d at 938 (Simon, J., concurring) (suggesting that directed verdict may be appropriate when the plaintiff presents a prima facie case, the defendant presents a legitimate non-discriminatory reason for the discharge, and the plaintiff fails to rebut the non-discriminatory reason).

In this case, the defendant presented a legitimate non-discriminatory reason and it would have been entitled to summary judgment, because the plaintiff simply failed to present sufficient evidence that the proffered reason was pretextual.