Herron MOOTYE, Plaintiff–Appellant,

v.

Timothy DOTSON, individually and in his official capacity, and City of Gary, Defendants–Appellees.

No. 02–2462.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 21, 2003.

Decided July 29, 2003.

Before CUDAHY, MANION, and ROVNER, Circuit Judges.

## ORDER

On June 4, 1996, Gary police officer Timothy Dotson shot Herron Mootye following a traffic stop. Mootye subsequently sued Dotson, the City of Gary, and Gary's police chief Charles Roby. Mootye alleged that Officer Dotson: a) searched and seized him without a warrant and without probable cause; b) subjected him to excessive force; and c) assaulted, battered, and subjected him to false imprisonment. Mootye also alleged that the City of Gary's negligent hiring and supervising of its police officers led to his injuries. The district court granted partial summary judgment in favor of the defendants City of Gary and Charles Roby, holding that the City of Gary, as a municipality, was

not liable to the plaintiff under 42 U.S.C. § 1983, and additionally, there was no evidence for individual liability against Roby. A jury trial then proceeded on Mootye's claims against Dotson and the City of Gary. The jury entered a verdict for the defendants. Mootye appeals and we AFFIRM.

## I.

Early in the morning of June 4, 1996, Herron Mootye was driving in Gary, Indiana with passenger Cynthia Bryant. At around 2:45 a.m., Officer Timothy Dotson pulled over Mootye after witnessing him run a red light. Dotson was on patrol that night with Deputy U.S. Marshal Jack Rosa, who was participating in an F.B.I. crime task force whereby he would accompany Gary police officers on their patrols. During the traffic stop an unfortunate yet strange and disputed series of events transpired that ended with Dotson shooting Mootye. Initially, Mootye exited his car, but Dotson ordered him to return. Dotson then approached the car alone and asked for Mootye's license, registration and whether he had a gun. Mootye responded that he had a gun but he had a permit, and handed both the gun and the permit, along with his driver's license, to Dotson. Dotson ordered Mootye to place the gun on the seat between himself and Bryant. He then instructed Mootye and Bryant to get out of the car. After they exited the car, Dotson unloaded the gun and placed it on the trunk. He then proceeded to search the car for the registration, which Mootye could not find, while Mootye waited near Dotson's police car and spoke with Deputy Rosa. It is at this point that the events of that morning, as told to the jury, radically diverge.

At trial, Dotson testified that during his search of the car for the registration, performed with Mootye's consent, he found a Pringles can between the seats. It appeared to hold something other than potato chips and when he popped open the top he found that it contained small packets of what looked to be cocaine. He then returned to the rear of the vehicle and attempted to handcuff Mootye, but Mootye refused to be handcuffed and struggled with both officers. Dotson then struck Mootye with his baton. Mootye responded with a head-butt to Deputy Rosa and fled down an alley. Dotson testified that he pursued Mootye down the alley and caught up with him, which resulted in several further scuffles, during which Mootye hit Dotson with a garbage can and Dotson drew his firearm. As the pursuit continued, Dotson slipped and lost control of his police baton. Mootye picked up the baton and raised it as if to strike Dotson. Fearing for his safety, Dotson shot Mootye in self-defense. Rosa did not witness the events in the alley as he was following the duo from a considerable distance and only arrived at the scene after the shooting occurred. To the extent he did witness the other events that evening, Marshal Rosa's testimony corroborated Dotson's version of the events.

Mootye told quite a different story. First, contrary to the testimony of Rosa and Dotson, he testified that Dotson was not wearing his police uniform when he pulled over his car and therefore he initially believed he was being robbed. Mootye also claims that he did not consent to Dotson's search of his car. Nevertheless, when Dotson produced the Pringles can containing the cocaine, Mootye claimed that it was not his and did not know where it came from. Mootye also stated that once Dotson discovered the can he did not try to place Mootye under arrest, but instead simply ordered him to the ground and began to hit him with his baton. In response, Mootye struggled to free himself

and acknowledged that during that struggle he unintentionally head-butted Rosa. After the head-butt, Mootye testified that he left the scene out of fear for his safety. With his arms raised in surrender, Mootye claimed he backed his way down the nearby alley for a short way, where he stopped and called for help. At this point, Mootye claims that as he held his hands over his head Dotson shot him at close range for no apparent reason.

At trial, two eyewitnesses were called by Mootye to testify as to the events in the alley. Louis Reese, a resident in the area of the traffic stop, testified that he saw someone walking backwards in the alley and a police officer moving toward the person. Reese then went from his den to the kitchen to get a better view, when he heard a shot. Marco Norris, another local resident, testified that he saw a guy walking, then running up the alley, as if he were being chased. Norris then saw that the man was backing up and he had his hands in the air. He tripped over what appeared to Norris to be a fence, a garbage can, or something. He then heard the man say "don't shoot—hey, don't shoot me." Then Norris heard a shot, but he did not see the shooting.

Mootye also called former police chief Steven Rhoads, as an expert witness, to refute Dotson's version of the incident. Rhoads testified that based on the forensic evidence, it was his opinion that Mootye was between three and five feet away from Dotson when he was shot. He also opined that based on the physical evidence at the scene, including the blood evidence and shell casings, the shooting could not have taken place in the manner described by Dotson. Additionally, Mootye also presented evidence that Cynthia Bryant and Officer Dotson shared a prior relationship. Specifically, Mootye called Michelle Hudson, his cousin, as a witness, who testified that Bryant was a drug user and a prostitute, and that Dotson operated a criminal enterprise with Bryant and was the father of her son, Tim. Dotson testified that he did not know Cynthia Bryant or Michelle Hudson.

After the shooting, Dotson called EMS and waited for their arrival. The City of Gary transported Mootye to Methodist Hospital in the custody of the Gary Police Department. Mootye suffered, among other injuries, a gun-shot wound to the right side of his chest, loss of a lung, major intra-abdominal bleeding, perforation of the transverse colon, multiple perforations of the small bowel, laceration of the right hemi-diaphragm, post-operative bleeding, respiratory failure, pneumonia, anemia caused by blood loss, jaundice, dysphagia and peritonitis, and paralysis of the leg. He incurred over $198,000 in medical bills due to these injuries. When Mootye was taken to the hospital he was also tested for drugs, which came back negative. He was later charged with a variety of offenses stemming from the traffic stop, all of which were dismissed.

Immediately after the shooting, the City of Gary confiscated Dotson's firearm and conducted an investigation into the events of that evening. Patrick Tracey, a detective in the Lake County Police Department, led the investigation. Tracey spoke with Dotson, Rosa, and Bryant, each individually. He found their statements to be consistent, and concluded that Dotson was justified in shooting Mootye, that his life was in danger, and that he used reasonable and necessary force.

Mootye filed a complaint against the City of Gary, Chief Roby, and Timothy Dotson in their official and individual capacities and asserted that Officer Dotson: a) searched and seized him without a warrant and without probable cause; b) subjected him to excessive force; c) assaulted,

battered, and falsely imprisoned him, and that the City of Gary's negligent, reckless, and deliberate action in hiring, investigating, retaining, disciplining, and supervising its police officers led to his injury. Prior to trial, the district court granted the defendants' motion *in limine* and excluded evidence that: 1) the City's negligent management of its police department harmed Mootye; 2) neither Dotson, Lake County, nor the City of Gary charged Mootye with a crime related to the contents of the Pringles can; 3) Dotson's charges against Mootye for resisting law enforcement and running a red light were dismissed; and 4) Dotson, on occasion, smoked crack cocaine with Cynthia Bryant. The court also denied Mootye's motion *in limine* to exclude the contents of the Pringles can.

Prior to trial, on August 6, 2001, the district court granted summary judgment in part, in favor of the defendants City of Gary, City of Gary Police Department and John Roby, holding that the defendant City of Gary, as a municipality, was not liable to the plaintiff under 42 U.S.C. § 1983, and additionally, there was no evidence for individual liability against Roby. On September 7, 2001, the jury entered a verdict for Timothy Dotson. Mootye then filed a motion for a new trial on September 20, 2001 which was denied. Mootye appeals.

## II.

Mootye raises four main arguments on appeal. First, he contends that the district court erred in denying his motion for new trial based upon the manifest weight of the evidence. Second, he argues that the district court erred in instructing the jury in both its preliminary and final instructions, and in giving a special verdict form to the jury. Third, he contends that the district court made several erroneous evidentiary rulings. Finally, he contends

that the district court erred in granting summary judgment in favor of the City of Gary on the issue of municipal liability under 42 U.S.C. § 1983.

## A. Motion for a New Trial

Mootye argues that the district court abused its discretion in denying his motion for a new trial on his claim against Dotson of excessive force. First, he contends that a new trial was warranted because the court applied the incorrect standard for the use of excessive force claim throughout the course of the trial. In support of this contention, Mootye cites the magistrate judge's statement made in denying Mootye's motion for a new trial:

> In order for the jury to find for Mootye, the jury had to conclude that Mootye was the victim of a plan to rob him (which involved Dotson and Bryant) and therefore not guilty of possessing drugs, that he was not fleeing or evading arrest at the time of the shooting, and that he did not pose a threat to Dotson.

Mootye contends that this was an erroneous view of the law that found its way into the court's rulings, its jury verdict forms, its jury instructions, and thus into the hearts and minds of the jury. Mootye argues that his only burden of proof at trial was to refute Dotson's claim that he posed an immediate threat. Mootye also argues that he met this burden based on the manifest weight of the evidence established through the testimony of Louis Reese, Marlon Norris, and Steven Rhoads, as well as the physical evidence.

This court reviews the district court's decision to deny the plaintiff's motion for a new trial for an abuse of discretion. *Cefalu v. Village of Elk Grove*, 211 F.3d 416, 424 (7th Cir.2000). A party seeking to reverse a district court's denial of a motion for a new trial "bears a particularly heavy burden." *Lowe v. Consol. Freightways of*

*Del., Inc.,* 177 F.3d 640, 641 (7th Cir.1999). This is because "the district court, having seen the presentation of the evidence and observed the course of the trial, is in a unique position to rule on a new trial motion." *Valbert v. Pass,* 866 F.2d 237, 239 (7th Cir.1989). A motion for a new trial should succeed "[o]nly when a verdict is contrary to the manifest weight of the evidence...." *Cefalu,* 211 F.3d at 424. This court will not overturn a jury verdict if a reasonable basis exists in the record to support it. *See Jackson v. Bunge Corp.,* 40 F.3d 239, 244 (7th Cir.1994). In reviewing the record, this court will not reweigh the evidence; instead, we view the evidence in the light most favorable to the prevailing party. *Id.*

Claims of excessive force, including those involving deadly force, are analyzed under an objective reasonableness standard. *Deering v. Reich,* 183 F.3d 645, 650 (7th Cir.1999). To determine whether the force used in a situation was excessive, it is necessary to consider the totality of the circumstances and whether the intrusion on the rights of the plaintiff was justified by the government's interest. *Jacobs v. City of Chicago,* 215 F.3d 758, 773 (7th Cir.2000). The ultimate inquiry is whether the force used was excessive in relation to the danger posed by the plaintiff. *Id.* In order to find excessive force in this case, the ultimate questions for the jury were whether Mootye posed an immediate threat to the safety of Dotson or to the public, and then whether the force used was reasonable given that threat. It is not dependent, as Mootye correctly points out, on whether or not Mootye was able to prove he was a victim of a plan to rob him, as that bears no relation to the danger he posed to Dotson. Therefore, if Mootye's conclusion as to the district court's statement is correct, i.e., that the court applied the incorrect standard for his cause of action based on excessive force, then the

district court abused its discretion because it is necessarily an abuse of discretion to base a decision on an incorrect view of the law. *See Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 405, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990).

■ Mootye's conclusion, however, is incorrect. The magistrate judge's statement, when read in context, was made in reference to the vastly divergent testimonies presented by the two parties. The magistrate judge was summarizing the testimony presented as to both Mootye's claims for the unreasonable search and the use of excessive force, as shown by the remainder of the magistrate judge's comments:

> Conversely, in order to find for Dotson, the jury had to conclude that Mootye was guilty of a crime, that he was actively fleeing and resisting arrest, and that he posed an immediate and serious threat to Dotson at the time of the shooting.

Thus, contrary to Mootye's arguments, the district court applied the correct standard of law, "that he posed an immediate and serious threat to Dotson at the time of the shooting." Therefore, we must affirm the district court's denial of Mootye's motion for a new trial if a reasonable basis exists in the record to support the jury's verdict. *Jackson,* 40 F.3d at 244.

■ Mootye contends that even if the court applied the correct standard, the failure to grant his motion for a new trial was nevertheless an abuse of discretion because insufficient evidence was presented to show that Dotson was facing an immediate threat of the use of deadly force, especially considering the eyewitness and expert testimony that supported Mootye's story. Mootye also contends that insufficient evidence was presented to show that Dotson's search of his vehicle, and the

Pringles can inside, was reasonable. However, as the district court notes, the jury was presented with significant evidence in support of Dotson's view of the events surrounding the search and the shooting, primarily from his testimony and the testimony of his partner on the scene, Rosa, and the officer who conducted the police inquiry, Tracey. Based on this testimony, the jury reasonably could find that Mootye consented to the search of his vehicle for his proof of vehicle registration. This consent could reasonably be seen to extend to containers in the car which could have contained the registration, such as the Pringles can, because consent to search a space also extends to containers within that space if it was reasonable for the police officer to "construe the consent to extend to the container." *United States v. Melgar*, 227 F.3d 1038, 1041 (7th Cir.2000); *see also Wyoming v. Houghton*, 526 U.S. 295, 302, 119 S.Ct. 1297, 143 L.Ed.2d 408 (1999). The jury also reasonably accepted Dotson's version of the events concerning the shooting of Mootye. Pursuant to Dotson's version of the events, Mootye, having obtained Dotson's baton, was posing an immediate threat to his safety because he was about to strike. The jury could have reasonably disregarded the testimony of Mootye and his two eyewitnesses due to the inconsistencies in their stories. And even though Dotson did not present his own expert to refute Rhoads' expert testimony as to the shooting, "it is the prerogative of a jury or other trier of fact to disbelieve uncontradicted testimony unless other evidence shows that the testimony *must* be true." *EEOC v. G–K–G, Inc.*, 39 F.3d 740, 746 (7th Cir.1994) (emphasis in original). In this case the evidence presented did not demonstrate that Rhoads' testimony must be true. In fact, Rhoads' testimony was consistent with Dotson's version of the events in that both men testified that Mootye and Dotson were within three feet of each other when the shooting occurred.

The jury was presented with two vastly different versions of the incident, and it performed its duty of weighing the evidence and making factual determinations in favor of one party and against the other. In light of the jury's verdict in favor of Dotson and the City of Gary, it would seem that the jury disbelieved the evidence offered by the plaintiff and believed Dotson's testimony, and the jury was entitled to do so. *See G–K–G, Inc.*, 39 F.3d at 746. Thus, in this case, because the widely divergent testimony could support either man's claims as to the sequence of events, it was not an abuse of discretion for the court to deny Mootye's motion for a new trial.

**B. Jury Instructions**

Next we turn to Mootye's contention that he deserves a new trial due to erroneous jury instructions and verdict forms. Mootye's first argument concerns Jury Instruction 14 which he contends incorrectly states the law of search and seizure and denied him the right to a verdict based on Dotson's illegal search of the Pringles can for drugs. The instruction outlines the law for a search based on consent and in pertinent part states "a motorist may consent to a search of his vehicle, and a police officer then may search the vehicle even if he does not have probable cause." Mootye claims that he did not consent to the search of the Pringles can and contends that this instruction is misleading since it does not state that even a consensual search is still limited by the boundaries of permission and reasonableness. Where a party is requesting a new trial based on erroneous jury instructions, the party must show that: 1) the instructions did not adequately state Seventh Circuit law, and 2) the party was prejudiced by the error

because the jury was likely confused or misled. *Susan Wakeen Doll Company, Inc. v. Ashton–Drake Galleries,* 272 F.3d 441, 452 (7th Cir.2001). An erroneous jury instruction cannot be found to be prejudicial unless considering the instructions as a whole, along with all of the evidence and arguments, the jury was misinformed about the applicable law. *Id.*

Mootye, however, did not make a specific objection to this portion of the instruction at trial. At the close of evidence, Mootye's sole objection to all of the instructions was phrased:

I think—you know, again as I said, 14, in the light of the jury of the verdict form and also that there is no nominal damages instruction in light of the one that the court actually tendered to the jury. But other than that, no, and the verdict form. [sic]

This objection does not address Mootye's concerns over the limits of a consensual search, and therefore he has waived any objection on appeal, and we review for plain error. *Chestnut v. Hall,* 284 F.3d 816, 819–820 (7th Cir.2002) ("A party's failure to object to even that portion of a jury instruction questioned on appeal results in a waiver under [Federal Rule of Civil Procedure] 51."). Moreover, even if Instruction 14 were erroneous, that error was harmless because the jury addressed Mootye's constitutional concerns when it specifically found that Mootye gave consent to Dotson to search the car and that the search of the contents of the Pringles can was reasonable. Even though Dotson's search for Mootye's car registration was exceedingly thorough, the search was not outside the bounds of reasonableness. The scope of a search is generally defined by its expressed object, *United States v. Lemmons,* 282 F.3d 920, 924 (7th Cir. 2002), and in this case the object was a car registration. There was no evidence that Dotson searched Mootye's car in places where a registration could not be found, and he only examined the contents of the Pringles can after looking through the glove compartment, the car's floor, and between the seats.

Mootye also argues that the verdict form was prejudicial and in error. The court gave the jury two verdict forms, one that instructed the jury that it could find for the defendants and against the plaintiff, and another that consisted of six interrelated questions concerning the issues and evidence raised at trial. Mootye contends that the verdict forms were confusing, twisted his contentions, and did not include a separate place for the jury to find for him and against the defendants. As evidence of this confusion Mootye notes that during deliberations, the jury told the court that it could not come to agreement as Question # 3 which asked the jury to find who placed the Pringles container in Mootye's car. The possible answers were Mootye, Dotson, Cynthia Bryant or Cynthia Bryant at the direction of Dotson. The district court instructed the jury to pass to the next question unless they reached a unanimous decision with regard to who placed the Pringles can in Mootye's car. A little later, the jury entered a verdict for Officer Dotson and for the City of Gary, but did not return an answer for Question # 3.

Under Rule 49(a) of the Federal Rules of Civil Procedure, the formulation of special verdict questions is a matter within the discretion of the trial court. *See United States Fire Ins. Co. v. Pressed Steel Tank Co.,* 852 F.2d 313, 316 (7th Cir.1988). The role of appellate review is to ensure that questions accurately, adequately and clearly state the relevant issues. Ambiguous, biased, misleading or confusing questions may warrant reversal. *See id.* Mootye's specific contentions with

respect to the inclusion of Question #3 have been waived because he did not object to the court's instruction that the jury disregard that question. *Chestnut*, 284 F.3d at 819–820. Even if we were to address the merits of Mootye's argument, he has not demonstrated that the district court abused its discretion in initially including this question in the verdict form. Mootye included a claim for wrongful arrest against Dotson which was not formally withdrawn until after the jury began deliberating. Question #3 therefore accurately reflected a relevant issue in the case because Dotson would not have had probable cause to arrest Mootye for drug possession if he himself planted the drugs. *See Tangwall v. Stuckey*, 135 F.3d 510, 518–19 (7th Cir.1998). Moreover, the question also comported with the evidence as presented at trial because Mootye testified that he did not know where the can came from, and presented testimony from Michelle Hudson that Dotson and Bryant operated a criminal enterprise together that involved conning motorists.

■ The district court similarly did not abuse its discretion in requiring a special verdict form. Mootye presented numerous claims to the jury, each with individualized damage calculations and affirmative defense considerations raised by the defendants concerning qualified immunity. As a whole the special verdict form accurately framed the issues to be resolved by the jury, and it reflected controlling law. *See Umpleby v. Potter & Brumfield, Inc.*, 69 F.3d 209, 213–214 (7th Cir.1995).

## C. Evidentiary Rulings

Mootye also argues that the district court erred in allowing the presentation of improperly prejudicial evidence and excluding relevant evidence. Specifically, Mootye contends that the district court erred when it granted the defendants' motion *in limine* excluding evidence that: 1) the City's negligent management of its police department harmed Mootye; 2) neither Dotson, Lake County, nor the City of Gary charged Mootye with a crime related to the contents of the Pringles can. Mootye also argues that the court erred in denying his motion to exclude the contents of the Pringles can. A district court's rulings on the admissibility of evidence are reviewed under an abuse of discretion standard. *Soller v. Moore*, 84 F.3d 964, 967–68 (7th Cir.1996). This court will order a new trial on the basis of the admission or exclusion of evidence alone "only if the error had a substantial influence over the jury, and the result reached was inconsistent with substantial justice." *Agushi v. Duerr*, 196 F.3d 754, 759 (7th Cir.1999) (internal quotations omitted).

■ The district court did not abuse its discretion in admitting the contents of the Pringles can. The evidence concerning the contents of the Pringles can was relevant to this case, as it dealt with the perceptions of Dotson during the traffic stop and his ultimate decision to arrest Mootye. *See Berry v. Deloney*, 28 F.3d 604, 607–08 (7th Cir.1994). The evidence tended to show why Mootye became uncooperative when Dotson announced that he had discovered the can, and why he fled the scene. Mootye is correct that the introduction of this evidence was prejudicial to his case and that the prejudice was exacerbated by the fact that Mootye was prevented from introducing evidence that he was not later charged with any drug related crime. However, the focus of Mootye's case was whether his civil rights were violated by Dotson's conduct in making the traffic stop, the search of the vehicle for the registration, the actions in effecting his arrest, and Dotson's subsequent use of force. Evidence that Mootye was not later charged with a crime was not

directly relevant to these considerations and may have confused the jury. Fed. R.Evid. 401 & 403; *see also West v. Carson,* 49 F.3d 433, 435 (8th Cir.1995). Hence, the district court did not abuse its discretion in excluding the fact that Mootye was never charged with a drug-related crime. Finally the district court did not abuse its discretion in excluding Mootye's "evidence", which consisted only of unrelated case law involving previous suits against the City, of negligent management of the police department by the City of Gary. Mootye did not make an evidentiary showing that would have linked these past cases of alleged wrongful conduct of other City of Gary police officers to Dotson's conduct. Similarly, there was no evidence to show that the City's alleged "deliberate indifference" was causally related to Mootye's alleged constitutional injuries. *See infra* p.10. This evidence was therefore properly deemed irrelevant and therefore it was not an abuse of discretion for the court to exclude it.

## D. Summary Judgment for the City of Gary

Finally we address Mootye's argument that the magistrate judge erred in granting summary judgment in favor of the City of Gary. Mootye argues that a genuine issue of fact existed as to whether the City of Gary had an unconstitutional policy of deliberate indifference toward the excessive force employed by its officers. This court reviews the district court's grant of summary judgment de novo and construes all facts and draws all reasonable inferences in the light most favorable to Mootye. *Ransom v. CSC Consulting, Inc.,* 217 F.3d 467, 468 (7th Cir.2000). Summary judgment is proper if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 321, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

 A municipality can be liable under Section 1983 only for acts taken pursuant to its official policy, statement, ordinance, regulation or decision, or pursuant to a municipal custom. *Monell v. Department of Social Services of the City of New York,* 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). An unconstitutional "custom" or "policy" of a municipality, as required to hold it liable for constitutional violations under § 1983, can take one of three forms: (1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a "custom or usage" with the force of law; or (3) an allegation that the constitutional injury was caused by a person with final policy-making authority. *Brokaw v. Mercer County,* 235 F.3d 1000, 1013 (7th Cir. 2000). Additionally, a plaintiff must demonstrate the requisite causation, i.e. the policy or custom was the "moving force" behind the alleged constitutional deprivation. *Gable v. City of Chicago,* 296 F.3d 531, 537 (7th Cir.2002). Therefore, in order to survive a motion for summary judgment on his § 1983 claim, Mootye needs to demonstrate a genuine issue of material fact that the City of Gary had a policy of being deliberately indifferent to its officers' use of excessive force and that the deliberate indifference led to his constitutional deprivation. Mootye cannot meet this standard. First, Mootye cannot demonstrate, based on the evidence offered, that the City has an express policy or widespread practice of endorsing or ignoring unconstitutional conduct. After the incident, the City itself requested an inde-

172

pendent investigation by someone outside the department into the shooting. The results of the investigation exonerated Dotson, as did the jury at the trial. Because of the result of the independent investigation, the City had no cause to look further into the matter or to take any other corrective action with regard to Dotson. Second, Mootye has not presented a scintilla of evidence that any City policy was causally related to his constitutional deprivations. In fact the evidence he presented at trial suggests quite the opposite scenario. Mootye presented testimony from Michelle Hudson that alleged that Dotson was engaged in a secret scheme, along with Bryant, to conduct traffic stops for illicit purposes wholly unrelated to his official duties. Finally, even if there was error in granting the motion for summary judgment, it was harmless under Fed. R.Civ.P. 61, because the jury verdict in favor of Officer Dotson on the various § 1983 claims precludes the possibility that Mootye could prevail on his *Monell* claim. *Thompson v. Boggs,* 33 F.3d 847, 859 (7th Cir.1994); *see also Los Angeles v. Heller,* 475 U.S. 796, 799, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986) *(per curiam).*

### IV.

For all of the above reasons we **AFFIRM** the district court.